Filed 2/24/22  P. v. Sanchez-Garcia CA5
Opinion following rehearing

### <u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>OSCAR SANCHEZ-GARCIA,<br><br>        Defendant and Appellant. | F078939<br><br>(Super. Ct. No. SF019281A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Jose R. Benavides, Judge.

Michelle T. LiVecchi-Raufi, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Appellant Oscar Sanchez-Garcia was convicted of one count of making criminal threats (Pen. Code, § 422)[1] for threatening to kill his mother. He was sentenced to the second strike term of six years in prison.

On appeal, Sanchez-Garcia contends his conviction must be reversed for insufficient evidence. He also argues the court improperly permitted the prosecution to introduce evidence that he called his mother from jail and encouraged her not to appear in court and about a prior incident when he assaulted his mother that occurred three years earlier. He separately argues his trial attorney was prejudicially ineffective for failing to request an instruction on voluntary intoxication. Finally, he contends that remand is required for the court to determine whether he has the ability to pay the restitution fine and other fees.

We filed an opinion affirming the judgment on January 24, 2022 (*People v. Sanchez-Garcia* (Jan. 24, 2022, F078939) [nonpub. opn.]). Thereafter, Sanchez-Garcia filed a petition for rehearing arguing two statutory enactments signed by the Governor on October 8, 2021, Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567) and Assembly Bill No. 124 (Assembly Bill No. 124) (2021-2022 Reg. Sess.), applied retroactively to Sanchez-Garcia's judgment of conviction under *In re Estrada* (1965) 63 Cal.2d 740, 748 (*Estrada*). We granted rehearing, vacated our initial opinion, and ordered supplemental briefing from the parties.

Having reviewed the parties' supplemental briefs, we accept their agreement that these enactments apply retroactively to this case, and that Assembly Bill No. 124 requires remand for resentencing. In light of our conclusion that the case is to be remanded for

---

[1]     All further statutory citations are to the Penal Code unless otherwise indicated.

2.

resentencing, Sanchez-Garcia's claim that he is entitled to an ability to pay hearing upon the court-imposed fines and fees is moot.    In all other respects, we affirm the judgment.

## FACTS

Sanchez-Garcia was 22 years old at the time of his trial in 2019.  P.S., his mother, was a field worker.  Sanchez-Garcia occasionally lived with his mother in Wasco.  As of July 2018, Sanchez-Garcia had been living with her for about one month, and he was not working.[2]

P.S. testified that on the afternoon of July 17, 2018, she drove around for five hours because she was trying to get a loan to rent a studio apartment.  Sanchez-Garcia was in the car with her; everything was fine between them.  She further testified that she tried to get a loan, but "[t]hey didn't lend me anything."

**Sanchez-Garcia's Statement to P.S.**

After she failed to get the loan, Sanchez-Garcia asked P.S. to drive to "Broadway" in Wasco.  P.S. testified that as she drove to that location, Sanchez-Garcia became angry, but they did not argue.  She testified that she had not seen Sanchez-Garcia drinking while they were driving around.[3]

P.S. testified that when they arrived on Broadway, Sanchez-Garcia told her to "to drive over to the field.  Tomorrow you will know God."  "[H]e said just go to the field because ma[ñ]ana you will see God."[4]  Sanchez-Garcia did not hit or strike her when he made the statement.

At trial, P.S. insisted that Sanchez-Garcia did not say he was going to kill her, she did not tell the investigating deputy that Sanchez-Garcia threatened to kill her, and the deputy's report to the contrary was not accurate.  P.S. initially testified that she did not

---

[2]    P.S. testified she was sad about the situation between a mother and son, and that she had to appear in court.

[3]    As will be explained below, P.S. told the investigating deputy, in a recorded statement, that Sanchez-Garcia bought a beer before he became agitated.

[4]    This statement is the basis for the criminal threat charge.

3.

know what Sanchez-Garcia meant when he made the statement, but subsequently admitted that she thought Sanchez-Garcia was threatening to kill her.

"Q.    But when he said you will see God, you thought that that was a threat?

"A.    Yes."

P.S. testified she became afraid when he made the statement because he was "upset," "angry," and "furious," but she did not think Sanchez-Garcia was "capable of doing it."

**P.S.'s Testimony About Sanchez-Garcia's Alleged Drug Use**

As we will discuss in issue IV, *post*, P.S. testified that she never saw Sanchez-Garcia use drugs, but she believed he used drugs that day because "[d]rugs make him change" and make him upset and angry, and she blamed "the drugs" as the reason he made the statement. Sanchez-Garcia's threat came out of nowhere "because he was under the influence of drugs."[5]

**P.S. Drives to Her Friend's Home**

At the time Sanchez-Garcia made the statement, P.S.'s home was about 10 minutes away from where she was driving. P.S. testified she decided to drive to the home of her friend, Letty, because Letty's residence was closer. She drove there because Sanchez-Garcia was upset, and she felt safer with her friend. P.S. got there within one or two minutes of when Sanchez-Garcia made the statement.

When P.S. arrived at Letty's house, she got out of the car, and Sanchez-Garcia stayed inside the car. P.S. took the car keys and ran inside Letty's home. Sanchez-Garcia did not say anything to her during the short drive or when she ran from the car.

P.S. testified Letty was home with several members of her family. P.S. told Letty and her family what Sanchez-Garcia said in the car, that he "was not in good shape, that

---

[5]    As we will discuss in issue IV, *post*, Sanchez-Garcia argues defense counsel was prejudicially ineffective for failing to request an instruction on voluntary intoxication based on P.S's testimony.

he told me to go to the field, that tomorrow I would see God, and I suppose I thought that there was a knife[,] but I didn't see a knife." P.S. testified she never saw a knife, and she was just guessing because of what he said about going to the field.[6]

P.S. testified that she asked Letty to call 911 because Sanchez-Garcia was upset, and P.S. was afraid. P.S. testified that one of the people at Letty's house was "Bre," who was the girlfriend of Letty's son. P.S. also told Bre what Sanchez-Garcia said in the car. Bre acted as her interpreter, called 911, and reported the incident.

When the deputies arrived at Letty's house, P.S. initially stayed inside while Bre went outside and talked with them. P.S. then went outside and saw the deputies with Sanchez-Garcia. P.S. testified a deputy asked her questions, but he did not speak Spanish, and Bre again acted as her interpreter.

**P.S.'s Recorded Statements to Deputy Pruneda**

Deputy Rene Pruneda of the Kern County Sheriff's Department responded to Letty's residence in Wasco at 9:24 p.m., on a dispatch of criminal threats and that the suspect possibly had a knife; other deputies also responded to the scene.

Deputy Pruneda testified that he spoke with P.S., and she was nervous, scared, and had tears in her eyes. Pruneda understood Spanish but only "somewhat" spoke the language, and a woman at the residence helped him communicate with P.S. Pruneda asked open-ended questions for P.S. to explain what happened. Pruneda activated his department-issued body-worn camera and recorded his interview with P.S. The recording was played for the jury and the transcript was introduced.

Deputy Pruneda asked P.S. if Sanchez-Garcia had any mental problems, and she said no. Pruneda asked P.S. what happened. P.S. said Sanchez-Garcia had been with her all day, and they were trying to rent a "studio." P.S. continued:

---

[6]     There was no evidence that Sanchez-Garcia was found in possession of a knife or a knife was recovered from P.S.'s car.

"[H]e was with me all day.  Then he bought himself a beer.  He started to get agitated, 'take me here, take me here, take me,' and he began to get agitated *and he told me that he was going to kill me.  He said, 'go to the field, tomorrow you see God.'  And I was afraid and I came over here*."[7] (Italics added.)

P. S. told Deputy Pruneda that this was not the first time Sanchez-Garcia had told her this.  "There has been another occasion that he has said he wanted to kill me.  And the truth is I am afraid."

Deputy Pruneda advised P.S. that if she wanted him arrested, then they would take him to jail, charges would be filed, and she would have to testify against him.  Pruneda asked if she would testify against her son.  P.S. said yes.

Deputy Pruneda testified an ambulance was called to the scene to "medically clear" Sanchez-Garcia, and he was cleared.[8]

**P.S.'s Testimony About Her Prior Statements**

P.S. reviewed a transcript of her prior statements to Deputy Pruneda about the charged offense and insisted that Sanchez-Garcia did not say he was going to kill her.

> "[THE PROSECUTOR].    You didn't tell the officer, and I quote: He, referring to your son, started to get agitated, take me here, take me here, take me.  And he – again, your son – began to get agitated and told me that he was going to kill me.  He said, quote, go to the field.  Tomorrow you see God, end quote.  And I was afraid and came over here.
>
> "A.    Yes.  He said all that, but he didn't say he was going to kill me.
>
> "Q.    Well, that's not the question that I'm asking you.  What I'm asking you is:  Is that what you told the deputy?

---

**7**    As noted above, P.S. testified at trial that Sanchez-Garcia never said he was going to kill her, and he was not drinking when they were driving around in the car.

**8**    After Deputy Pruneda testified Sanchez-Garcia was "medically cleared," the prosecutor asked where Sanchez-Garcia was taken after that.  Defense counsel objected.  The prosecutor stated that he wanted to "make sure that [Sanchez-Garcia] was cleared, that there were no mental health issues or medical issues that contributed to that that the deputy noted."  The court granted the objection and instructed the parties to continue.

6.

"A.    No."

P.S. again denied making certain statements to Deputy Pruneda:

"[THE PROSECUTOR].    Okay.  Did you tell the officer that this is not the first time he tells me this, and I quote, because it's not the first time he tells me this.  There has been another occasion—

"A.    No.

"Q.    Did you tell [the deputy] there has been another occasion that [Sanchez-Garcia] has said he wanted to kill me?

"A.    No.

"Q.    Did you tell the officer:  And the truth is, I'm afraid?

"A.    At the time, I was afraid.

"Q.    But you didn't say that he was going to kill you?

"A.    No.

"Q.    And you didn't say that this is not the first time he said he's wanted to kill you?

"A.    There hasn't been any, no."

The prosecutor asked P.S. if she was aware that Deputy Pruneda was recording her statements.  She said no.  The prosecutor asked if the recording was correct.  P.S. insisted Sanchez-Garcia did not say he was going to kill her, and she did not make that statement to the deputy.

**Sanchez-Garcia Calls P.S. From Jail[9]**

The parties stipulated that on September 3, 2018, Sanchez-Garcia called P.S. from jail.  The court took judicial notice that at the time of the call, Sanchez-Garcia's preliminary hearing was set for September 11, 2018.  The recording of the call was played for the jury, and the transcript was introduced.

---

**9**    As will be discussed in issue II, *post*, the court granted the prosecution's motion, over Sanchez-Garcia's objection, and admitted evidence about Sanchez-Garcia's call from jail.

According to the transcript, Sanchez-Garcia asked P.S. what she knew about the case and "how much … they want[ed] to give [him]." P.S. said she would not see them "until the 11th." Sanchez-Garcia said: "Look, that, that, that day on the 11th, don't go. They are going to be calling you. Just tell them … that you were sick and you were not feeling well and you could not answer the phone until three (3)." Sanchez-Garcia continued: "If you don't go, it is going to help my case. They are going to have to have it dismissed."

P.S. asked Sanchez-Garcia if they were going to do something to her if she did not show up. Sanchez-Garcia said they would not do anything and explained "it's a sign and release. It's just like … a ticket for not showing. [It's] like a ticket," like when his father got a parking ticket.

As the call continued, Sanchez-Garcia again told P.S.: "It's just a fine. Just tell them, that day, just don't go. That you were sick. 'I was sick, I, I, fell asleep, and I couldn't, I couldn't answer the phone. My phone was … I couldn't find the phone.' You just do something, that, that day, they are going to dismiss my case and they are not going to give me years and what I am thinking is, really?" P.S. said she cared about him and wanted him out.

At trial, P.S. acknowledged the call occurred but testified she did not feel Sanchez-Garcia was trying to scare her or stop her from testifying against him.

### THE 2015 INCIDENT[10]

*P.S.'s Trial Testimony*

P.S. testified that Sanchez-Garcia did not threaten to kill her during the charged offense and denied mentioning a prior incident to Deputy Pruneda. The prosecutor then

---

**10** As will be discussed in issue III, *post*, the court overruled Sanchez-Garcia's objections and granted the prosecution's motion to introduce evidence about the 2015 incident.

asked if she remembered an incident when she called the sheriff's department in May 2015.

P.S. testified Sanchez-Garcia lived with her in 2015. She thought he was using drugs at that time and testified that he would get upset when he used drugs. On that particular day in May 2015, Sanchez-Garcia got upset and broke a table; he used a piece of the broken table to hit her in the back. He did not threaten to kill her. She denied that Sanchez-Garcia hit her in the head. As she testified, she pointed to her shoulder as the location where she was injured.

> "[THE PROSECUTOR]. If the officer said that you got hit in the head [in 2015] and that's where he saw the injuries, what would you say to that?
>
> "A. Not on my head. In the back of my head but not on my head."

P.S. testified that after Sanchez-Garcia hit her with the piece of the table, she was afraid of him because he was upset, and she was hurt.

### The Investigation of the 2015 Incident

Deputy Raymond Seibert of the Kern County Sheriff's Department testified at the trial in this case that he responded to P.S.'s apartment in Wasco on May 4, 2015. Sanchez-Garcia was present. Seibert testified P.S. was "a little frightened, a little disheveled."

Deputy Seibert testified P.S. reported she had been in an altercation with Sanchez-Garcia. P.S. said he hit her over the head with a table leg, and she was injured; she showed him where she was injured. Seibert saw a bump on the left rear side of P.S.'s head, on her scalp and under her hair. The bump was about an inch and a half in size, and it looked "pretty fresh." Seibert took photographs of the head injury and the table leg used to inflict it; the photographs were introduced at this trial.

9.

*P.S.'s Testimony About Sanchez-Garcia's Anger*

On direct examination at trial, P.S. initially testified that during the prior incident in 2015, Sanchez-Garcia was not upset in the same way that he was at the time of the charged offense in 2018. On further examination, P.S. testified that Sanchez-Garcia "gets upset under the influence of drugs the same way."

"[THE PROSECUTOR]. … He hit you hard enough [in 2015] and you were scared and he was upset enough that you had to call the police?

"A.    I was scared.

"Q.    Why were you scared?

"A.    Because he was upset.

"Q.    And he was upset in July of 2018; right?

"A.    Yes."

P.S. testified she never saw Sanchez-Garcia use drugs, "but his actions and his attitude make me believe that he does drugs," and thought he was using drugs at the time of both the 2015 incident and the charged offense.

## PROCEDURAL BACKGROUND

On September 12, 2018, an information was filed in the Superior Court of Kern County charging Sanchez-Garcia with count 1, criminal threats, with one prior serious felony enhancement (§ 667, subd. (a)), one prior strike conviction, and one prior prison term enhancement (§ 667.5, subd. (b)).

On February 5, 2019, Sanchez-Garcia's jury trial began with the presentation of evidence.

On February 6, 2019, Sanchez-Garcia was convicted of the charged offense. Thereafter, Sanchez-Garcia admitted the prior conviction allegations.

*Sentencing*

On March 5, 2019, the trial court granted Sanchez-Garcia's motion to dismiss the prior serious felony enhancement (§ 667, subd. (a)) and the prior prison term

10.

enhancement (§ 667.5, subd. (b)).  The court imposed the upper term of three years, doubled to six years as the second strike sentence.  Sanchez-Garcia filed a timely notice of appeal.

## DISCUSSION

### I.      Substantial Evidence of Criminal Threats

Sanchez-Garcia contends his conviction for violating section 422, criminal threats, must be reversed for insufficient evidence because his statements in the car did not constitute a threat of death or great bodily injury, his statement was not a clear, unconditional threat with an immediate prospect of execution, and P.S. was not in sustained or reasonable fear as a result of his statements.

### A.      *Substantial Evidence*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing

11.

court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

### B.      Section 422

Section 422 defines the offense of criminal threats as follows:

"Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (§ 422, subd. (a).)

### C.      Elements of the Offense

"In order to prove a violation of section 422, the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement … [was] to be taken as a threat, even if there [was] no intent of actually carrying it out,' (3) that the threat … was 'on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her

immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)[11]

"Section 422 'was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others. [Citation.]' [Citation.] The statute 'does not punish such things as "mere angry utterances or ranting soliloquies, however violent." [Citation.]' [Citation.] Instead, a criminal threat 'is a specific and narrow class of communication,' and 'the expression of an intent to inflict serious evil upon another person.' " (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805 (*Wilson*).)

" 'A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does "not communicate a time or precise manner of execution, section 422 does not require those details to be expressed." [Citation.]' [Citation.] In addition, section 422 does not require an intent to actually carry out the threatened crime. [Citation.] Instead, the defendant must intend for the victim to receive and understand the threat, and the threat must be such that it would cause a reasonable person to fear for his or her safety or the safety of his or her immediate family. [Citation.] 'While the statute does not require that the violator intend to cause death or serious bodily injury to the victim, not all serious injuries are suffered to the body. The knowing infliction of mental terror is equally deserving of moral condemnation.' " (*Wilson*, *supra*, 186 Cal.App.4th at p. 806.)

"[A] prosecution under section 422 does not require an unconditional threat of death or great bodily injury." (*People v. Bolin* (1998) 18 Cal.4th 297, 338.) "[T]he reference to an 'unconditional' threat in section 422 is not absolute." (*Id*. at p. 339.) Section 422's use of the word "unconditional" was not meant " 'to prohibit prosecution of all threats involving an "if" clause, but only to prohibit prosecution based on threats

---

[11]    The California Supreme Court has clarified that "a threat made through nonverbal conduct falls outside the scope of section 422 as currently written." (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1147.) This requirement does not apply in the instant case since the criminal threats charge was based on Sanchez-Garcia's verbal statement to P.S.

whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution.' " (*Ibid.*)

"Moreover, imposing an 'unconditional' requirement ignores the statutory qualification that the threat must be '*so ... unconditional … as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution .…*' [Citation.] 'The use of the word "so" indicates that *unequivocality, unconditionality, immediacy and specificity are not absolutely mandated,* but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.] 'If the fact that a threat is conditioned on something occurring renders it not a true threat, there would have been no need to include in the statement the word "so." ' [Citation.] This provision 'implies that there are different degrees of unconditionality. A threat which may appear conditional on its face can be unconditional under the circumstances.… [¶] Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution.' " (*Bolin, supra,* 18 Cal.4th at p. 340, second italics added.)

"Thus, the third element's four enumerated statutory elements – unequivocality, unconditionality, immediacy and specificity – are ' "simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." ' " (*Wilson, supra,* 186 Cal.App.4th at p. 807.)

"While the third element of section 422 also requires the threat to convey ' "a gravity of purpose and an immediate prospect of execution of the threat," ' it 'does not require an immediate ability to carry out the threat. [Citation.]' [Citations.] 'The "immediate *prospect* of execution" in the context of a conditional threat is obviously to be distinguished from those cases dealing with threats of immediate harm, recognized at

14.

the very moment of the threat, such as those which support a defense of duress or necessity.' " (*Wilson*, *supra*, 186 Cal.App.4th at p. 807.) " '[W]e understand the word "immediate" to mean that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out, should the conditions not be met.' " (*Ibid.*)

"The fourth and fifth elements of section 422 require the victim 'reasonably to be in sustained fear' for his or her own safety or the safety of his or her family. (§ 422.)" (*Wilson*, *supra*, 186 Cal.App.4th at p. 808.) This "requires proof of a mental element in the victim." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).) "The word fear, of course, describes the emotion the victim experiences." (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 (*Fierro*).) " 'Sustained fear' refers to a state of mind." (*Ibid.*) Sustained fear "means a period of time that extends beyond what is momentary, fleeting, or transitory." (*Allen*, *supra*, at p. 1156.) Even a single minute of fear may qualify as "sustained" under the statute. (*Fierro*, *supra*, at p. 1349.) "When one believes he [or she] is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*Ibid.*) " 'The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear.' " (*Wilson*, *supra*, at p. 808.)

### D. Analysis

Sanchez-Garcia's conviction for criminal threats is supported by substantial evidence because he made a clear and express threat to kill P.S. P.S. told Deputy Pruneda that Sanchez-Garcia became agitated and "he told me that he was going to kill me." P.S. told Pruneda and testified that Sanchez-Garcia told her to "to drive over to the field. Tomorrow you will know God." "[H]e said just go to the field because ma[ñ]ana you will see God."

Sanchez-Garcia argues his statements did not constitute a threat of death or great bodily injury. P.S. tried to minimize some aspects of Sanchez-Garcia's statements when she testified, but her prior inconsistent statements were admitted through Deputy

15.

Pruneda's bodycam recording – she told Pruneda that as she drove Sanchez-Garcia to Broadway, "[h]e started to get agitated, 'take me here, take me here, take me,' and he began to get agitated *and he told me that he was going to kill me. He said, 'go to the field, tomorrow you see God.' And I was afraid and I came over here*." (Italics added.) On further examination, P.S. admitted that "when he said you will see God," she thought that was a threat, he was threatening to kill her, and she became afraid because of what he said and how he was upset, angry, and furious.

Sanchez-Garcia argues there was insufficient evidence the alleged threat was clear, unconditional, or had the prospect of immediate execution, since he used the word "tomorrow" when he made the statements. " 'A threat is not insufficient simply because it does "not communicate a time or precise manner of execution, section 422 does not require those details to be expressed." ' " (*Wilson*, *supra*, 186 Cal.App.4th at p. 806.) While Sanchez-Garcia said that P.S. would see God "tomorrow," that word did not undermine the immediacy of the threat. P.S. told Deputy Pruneda that Sanchez-Garcia threatened to kill her and directed her to drive to "the fields" at that moment, and she was frightened by his threat because she decided to instead drive to her friend's nearby house where she would feel safer. Sanchez-Garcia's additional comment about "tomorrow" may have meant that he would do something and leave her in the field to slowly die.

There is no evidence that Sanchez-Garcia was found in possession of a weapon or a weapon was found in the car, and P.S. testified he did not make any physical actions toward her after he made the statements. However, the absence of a weapon or a physical assault do not undermine the immediacy of the threat because section 422 does not require an intent to actually carry out the threatened crime or the immediate ability to carry out the threat. (*Wilson*, *supra*, 186 Cal.App.4th at p. 806.) " '[W]e understand the word "immediate" to mean that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out, should the conditions not be met.' " (*Id*. at p. 807.)

16.

Sanchez-Garcia argues there was insufficient evidence P.S. was in sustained fear of him, or that fear was reasonable. P.S.'s testimony refutes this assertion. While she attempted to minimize his statements, she consistently testified that she became frightened by what he said in the car and decided to drive to her friend's house because it was closer to her location, and she knew she would feel safer there. P.S. testified that she arrived at Letty's house within one or two minutes after Sanchez-Garcia made the threat. She told Letty and Letty's family what had happened and testified that she asked them to call 911 because she was still afraid. Deputy Pruneda testified that when he arrived, P.S. was nervous, scared, and had tears in her eyes. When Pruneda asked P.S. what happened, she recounted Sanchez-Garcia's statements and added, "I was afraid and I came over here," "the truth is I am afraid," and said she was willing to testify against Sanchez-Garcia.

As explained above, fear is sustained when it lasts for "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen*, *supra*, 33 Cal.App.4th at p. 1156.) Even a single minute of fear may qualify as "sustained" under the statute. (*Fierro*, *supra*, 180 Cal.App.4th at p. 1349.) "When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*Ibid*.) While there is no evidence about the precise passage of time, it is clear that Sanchez-Garcia's threat resulted in P.S. suffering sustained fear from the moment he made the statement in the car, continuing through the brief time it took for P.S. to drive to Letty's house, P.S.'s discussion with Letty and Letty's family about what happened, her decision to have Bre call 911, continuing to when Deputy Pruneda arrived and initially talked to Letty's family, and still existed when P.S. ultimately gave her recorded statement to Pruneda.

Sanchez-Garcia relies on *In re Ricky T.* (2001) 87 Cal.App.4th 1132 (*Ricky T.*), that reversed a juvenile court's finding of a section 422 violation for insufficient evidence, and argues the instant case is similar to the facts and also requires reversal. In *Ricky T.*, a 16-year-old minor left class to use the restroom at school and found the

classroom door locked when he returned. The minor pounded on the door, the teacher swung it open, and the door hit the minor. The minor became angry, cursed the teacher, and said, " 'I'm going to get you.' " The teacher sent the minor to the office, but the incident was not reported to the police until the following day. One week later, the minor admitted to an officer that he told the teacher that he was going to "kick [his] ass," and he was charged with violating section 422. (*Ricky T.*, *supra*, at pp. 1135-1136.)

*Ricky T.* reversed the juvenile court's finding that the minor violated section 422 for insufficient evidence and held the circumstances of the minor's statements showed his alleged threats lacked credibility because they were not "serious, deliberate statements of purpose." (*Ricky T.*, *supra*, 87 Cal.App.4th at p. 1137.) The teacher's act of sending the minor to the office did not establish that the threat was "so immediate" under section 422, since the police were not contacted until the next day. There was no evidence suggesting a physical confrontation was imminent or that the teacher and minor had any prior history of conflicts. The court concluded the minor's remark, " 'I'm going to get you' [was] ambiguous on its face and no more than a vague threat of retaliation without prospect of execution." (*Ricky T.*, *supra*, at p. 1138.)

*Ricky T.* does not support Sanchez-Garcia's argument that the evidence in this case is similarly insufficient because the minor's remark in *Ricky T.* was vague and ambiguous, and the police were not contacted until the following day. In this case, however, Sanchez-Garcia expressly threatened to kill P.S., and his threat carried sufficient immediacy because he could have overpowered her in the car at any time. P.S. suffered from sustained fear, and that fear was reasonable, because she testified that he was agitated, angry, and upset when he made the statements, and she decided to drive to her friend's nearby house since she was afraid and knew she would feel safer there. P.S.'s decision to drive to her friend's house was consistent with her realization that Sanchez-Garcia could carry out his threat while she was isolated in the car with him. P.S. testified she was still frightened after she told her friend's family what happened and

agreed they should call 911. Deputy Pruneda testified that P.S. was nervous, scared, and had tears in her eyes, and the bodycam recording showed that she told Pruneda that she was still scared and afraid.

We thus conclude Sanchez-Garcia's conviction for violating section 422 is supported by substantial evidence.

## II.    Admission of the Jail Call

Sanchez-Garcia next contends the court abused its discretion when it admitted evidence of Sanchez-Garcia's jail call to P.S. because the call was irrelevant and prejudicial, and the error was exacerbated when the court instructed the jury with CALCRIM No. 371 on consciousness of guilt because the instruction contained a permissive inference and violated his due process rights.

### A.    *Background*

Prior to trial, the prosecutor moved to introduce evidence that Sanchez-Garcia called P.S. when he was in jail after he was arrested in this case. The call occurred shortly before the preliminary hearing and Sanchez-Garcia told her not to come to court. The prosecutor's motion argued Sanchez-Garcia's statements were admissible as admissions. The motion requested to introduce a transcript of the telephone call, that lasted less than five minutes and was translated from Spanish to English, and for judicial notice of the scheduled date for the preliminary hearing.

At a hearing on the motion, the prosecutor argued Sanchez-Garcia's statements to P.S. during the jail call were relevant as to his consciousness of guilt because he tried to dissuade the only witness to the charged offense not to testify.

Defense counsel opposed the motion and argued evidence of the jail call would be unduly prejudicial under Evidence Code section 352. Counsel argued P.S. did not want to cooperate or testify in this case from the beginning, and Sanchez-Garcia just responded to her concerns and explained that if she did not testify, "that she's not going to get in as much trouble as she thinks."

## B.     The Court's Ruling

The court granted the prosecution's motion to introduce evidence of Sanchez-Garcia's call from jail: "Just listening to the argument, it's obviously, in my mind anyway, something for cross-examination." Defense counsel asked the court to play the entire tape recording of the call, even though it was in Spanish, so the jury could hear the tenor of their voices. The court agreed.

The court and the parties reviewed the transcript of the call, and defense counsel objected to certain portions where Sanchez-Garcia referred to previously serving time and his possible sentence in this case. The prosecutor replied Sanchez-Garcia's voluntary statements were relevant to show his motive in asking P.S. not appear because he did not want to return to prison.

The court granted defense counsel's motion to exclude certain sections from the translated transcript. The court and the parties also agreed to a stipulation for the jury to authenticate the telephone call.

As set forth above, the recording of Sanchez-Garcia's call was played for the jury, the transcript introduced into evidence, and the parties stipulated to the dates of the call and the scheduled preliminary hearing.

## C.     CALCRIM No. 371

The court instructed the jury with CALCRIM No. 371 regarding the jail call:

"If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

## D.     Analysis

A defendant's efforts to suppress harmful evidence is relevant and probative of his or her consciousness of guilt. (*People v. Flinner* (2020) 10 Cal.5th 686, 719-720; *People v. Vines* (2011) 51 Cal.4th 830, 867, overruled on another point by *People v. Hardy*

20.

(2018) 5 Cal.5th 56, 104; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) "The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.) Evidence showing consciousness of guilt is generally admissible within the trial court's discretion, and the court's ruling is reviewed for abuse of that discretion. (*People v. Anderson* (2018) 5 Cal.5th 372, 391; *People v. Kopatz* (2015) 61 Cal.4th 62, 85.)

Sanchez-Garcia argues evidence about his jail call to P.S. was irrelevant and prejudicial because there was no dispute Sanchez-Garcia made the statements to P.S. in the car, but the defense theory was that he did not intend to threaten P.S. Sanchez-Garcia asserts that he "fails to see how a call to his mother attempting to discourage her from testifying was relevant in helping to prove to the jury whether his conduct was 'wilfull,' 'unequivocal' or caused his mother to be in 'sustained fear for [her] own safety.' "

The court did not abuse its discretion. Sanchez-Garcia's arguments beg the question about the potential evidence against him. P.S. was the only witness to Sanchez-Garcia's threat in the car. While Deputy Pruneda recorded P.S.'s report about the threat on his bodycam, there is no evidence that Sanchez-Garcia was present at the moment that Pruneda interviewed P.S. outside Letty's house, or that Sanchez-Garcia was aware of the existence of the recording when he called P.S. from jail. Indeed, Sanchez-Garcia's first question to P.S. was whether "they" had said anything about how much time he faced, indicating that he was unaware of the full extent of the prosecution's case. P.S. testified she did not know her statements to Pruneda were recorded.

Based on these circumstances, Sanchez-Garcia's efforts to convince P.S. not to appear at the preliminary hearing were highly relevant for the jury to consider as to his consciousness of guilt – that he attempted to persuade the only eyewitness to his threat in the car not to testify at the preliminary hearing so that the charge would be dropped.

The undue prejudice that Evidence Code section 352 protects against is not " 'the damage to a defense that naturally flows from relevant, highly probative evidence,' " but that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1035.) Sanchez-Garcia's statements to the only eyewitness were highly probative of his consciousness of guilt and were not unduly prejudicial.

Sanchez-Garcia further argues CALCRIM No. 371 violated his due process rights and was prejudicial because it directed the jury to make an improper permissive inference of guilt from his statements during the call from jail.[12] CALCRIM No. 371 is an instruction that permits, but does not require, the jury to draw a particular inference, and "[p]ermissive inferences violate due process only if the permissive inference is irrational." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 270; *People v. Wiidanen* (2011) 201 Cal.App.4th 526, 533.) The California Supreme Court has rejected similar challenges to the constitutionality of CALCRIM No. 371 and other instructions on consciousness of guilt. (See *People v. Scully* (2021) 11 Cal.5th 542, 595-596; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 336, 438; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102-103; *People v. Taylor* (2010) 48 Cal.4th 574, 630; *People v. Jackson* (1996) 13 Cal.4th 1164, 1222-1224; *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1158-1159.) We decline to reconsider or overrule these cases. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### III. Admission of the 2015 Incident

Sanchez-Garcia contends the court improperly granted the People's motion to introduce evidence about the 2015 incident, when he hit P.S. with the table leg. Sanchez-Garcia argues the 2015 incident was not similar enough to the charged offense to be

---

[12] Sanchez-Garcia concedes he did not object to CALCRIM No. 371. As he notes, however, we may review a claim of instructional error that may affect a defendant's substantial rights even when the defendant failed to object. (*People v. Cage* (2015) 62 Cal.4th 256, 285 (*Cage*).)

relevant and admissible for any purpose under Evidence Code section 1101 because it involved a physical assault since the charged offense was based on verbal statements. Sanchez-Garcia asserts that evidence about the prior incident "amounted to no more than character evidence to show that [he] had the propensity to commit the current offense."

Sanchez-Garcia argues the admission of the evidence was prejudicial because there was insufficient evidence that P.S. was in sustained fear to support the section 422 conviction, and "[o]nce the jury heard the prior conduct evidence, it was easy for them to conclude that [Sanchez-Garcia] was capable of violent behavior in 2018, regardless of whether the evidence of the current offense demonstrated that [P.S.] was actually in fear."

### A.     *Sanchez-Garcia's Motion to Exclude*

Defense counsel filed a pretrial motion to exclude any evidence of Sanchez-Garcia's prior convictions.

The defense motion also anticipated the prosecution would move to admit evidence of the 2015 incident where Sanchez-Garcia hit P.S. with the table leg and argued the evidence should be excluded because Sanchez-Garcia was "18 at the time and was off of his ADHD medication," the evidence was "not admissible under any exception to "[Evidence Code] section 1100," and it was prejudicial under Evidence Code section 352.

### B.     *The Prosecution's Motion to Admit the 2015 Incident*

In response, the prosecutor filed a pretrial motion in limine that if Sanchez-Garcia testified, he should be impeached with his prior convictions for felony robbery in October 2015 (§ 212.5), and misdemeanor assault with a deadly weapon in May 2015 (§ 245, subd. (a)(1)); the assault conviction was based on the incident where Sanchez-Garcia hit P.S. with the table leg.

As a separate matter, the prosecution's motion sought to introduce evidence about Sanchez-Garcia's prior act of hitting P.S. with the table leg in 2015, independent of his prior conviction and regardless of whether he testified.  The prosecution's motion argued

23.

his prior conduct was admissible because it was "highly relevant as it goes to the credibility of [Sanchez-Garcia's] threat, the sustained fear element, and the reasonability of [P.S.'s] fear," since the People had the burden of proving these elements for a violation of section 422. The prosecution's motion argued the evidence was not being used to prove Sanchez-Garcia's conduct in conformity but to show his "threats [were] credible, that he meant them when he said them, that [P.S.'s] fear was credible, and that she would be correct in fearing [Sanchez-Garcia] would actually attempt to carry out these threats."

The prosecution's motion expressly relied on *People v. Culbert* (2013) 218 Cal.App.4th 187 (*Culbert*) in support of introduction of the 2015 incident and summarized the facts, where the defendant in that case was charged with making a criminal threat to his son, and the court held his prior criminal threat to his former wife in the son's presence was admissible to show the defendant's intent that his statements during the charged offense should be understood as threats, and the reasonableness of his son's fear after the threat was made. As applicable to this case, the prosecution argued the trial court "would be on extremely solid ground" to rely on *Culbert* and admit evidence about the 2015 incident since it involved the same victim.[13]

### C.      *Pretrial Hearing*

Prior to trial, the court heard the parties' arguments on whether evidence about the 2015 incident was admissible. The prosecutor argued evidence about Sanchez-Garcia's conduct during the 2015 incident was admissible independent of his prior conviction, and P.S. could testify about the incident without mentioning the conviction.

Defense counsel argued the evidence should be excluded because there was "a very specific reason for that behavior" in 2015 and it had nothing to do with the charged offense. Counsel cited to the police report from 2015, where P.S. said Sanchez-Garcia

---

[13]      We will further address the facts and holding in *Culbert* below.

was 18 years old, he was "off his ADHD medicine," and he tore up the house and hit her with a table leg, as the different circumstances.

### 1. The Court's Ruling

The court held Sanchez-Garcia's prior criminal convictions were inadmissible unless he testified. As to the evidence about the 2015 incident, the court stated: "I'm going to permit the witness to testify as to the prior incident without – but not testify that there was a conviction arising from that."

### D. *Motion for Mistrial*

As set forth above, P.S. testified on direct examination and denied making certain statements to Deputy Pruneda about the charged offense. The prosecutor asked her:

> "Q. *And you didn't say that this is not the first time he said he's wanted to kill you?*
>
> "A. *There hasn't been any, no.*" (Italics added.)

Immediately after this exchange, the prosecutor asked P.S. about the 2015 incident, as set forth above. Shortly after this testimony and outside the jury's presence, defense counsel moved for a mistrial and argued the prosecutor improperly relied on the 2015 incident for a matter beyond the court's earlier evidentiary ruling because it was admitted for the limited purpose of establishing P.S.'s reasonable belief and sustained fear as elements of the criminal threats charge. Counsel conceded P.S. "obviously was not very forthcoming," did not want to testify, and downplayed the incident, but argued the prosecutor improperly used the 2015 incident to impeach "the alleged victim and as … propensity evidence that [Sanchez-Garcia] tends to be violent and therefore [P.S.] must be lying if she said she wasn't afraid of him that day."

The prosecutor replied that his questions to P.S. were within the court's evidentiary ruling because he asked whether she was afraid of Sanchez-Garcia when Sanchez-Garcia made the statements in the car based on the prior 2015 incident, in order to show her sustained and reasonable fear. The prosecutor stated he would argue to the

jury that her fear was reasonable and sustained when Sanchez-Garcia threatened her in the car because Sanchez-Garcia was similarly upset and angry during the prior incident.

### 1. The Court's Denial of the Mistrial Motion

The court denied Sanchez-Garcia's motion for mistrial and found the prosecutor's questions about whether Sanchez-Garcia was upset during both the 2015 incident and the charged offense were "simply trying to make an argument that if he was upset in a similar manner in the latter incident as he had been in the prior incident, there would be a reason for her to be afraid in the second incident as she was in the first incident." The court granted defense counsel's request for a limiting instruction about the 2015 incident.

### E. The Prosecution's Motion to Call the Investigating Deputy

After P.S. testified, the prosecutor moved to call Deputy Seibert because he investigated the 2015 incident, interviewed P.S., and took photographs of P.S.'s head injury and the table leg. The prosecutor argued Seibert's testimony was relevant to impeach P.S.'s trial claim that Sanchez-Garcia did not hit her on the head during the 2015 incident, her attempt to minimize the incident, her attitude toward the prosecution, and refute her claim that she wasn't afraid of Sanchez-Garcia.

Defense counsel objected to calling Deputy Seibert. In the alternative, counsel argued that would open the door to introducing defense evidence about other circumstances surrounding the 2015 incident that the prosecution previously objected to, such as P.S.'s statements that Sanchez-Garcia was not taking his ADHD medication, she did not want Sanchez-Garcia prosecuted in this case, and she only wanted him to get help.

### 1. The Court's Ruling

The court held the prosecutor could call Deputy Seibert about the 2015 incident, and that would open the door to defense counsel asking P.S. about further evidence regarding the 2015 incident. At trial, Deputy Seibert testified as set forth above. Defense counsel did not recall P.S. to testify about any other aspects of the 2015 incident.

### F. Instruction

The court granted defense counsel's motion for a limiting instruction on the prior acts evidence and gave CALCRIM No. 375 as follows.

> "The People presented evidence that [Sanchez-Garcia] committed another offense of assault with a deadly weapon that was not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that [Sanchez-Garcia] in fact committed the uncharged offense or act."

The instruction defined proof by a preponderance of the evidence and further stated:

> "If you decide that [Sanchez-Garcia] committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether the threat actually caused [P.S.] to be in sustained fear for her own safety and/or whether [P.S.'s] fear was reasonable under the circumstances.

> "In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense. Do not consider this evidence for any other purpose. Do not conclude from this evidence that [Sanchez-Garcia] has a bad character or is disposed to commit a crime. If you conclude that [Sanchez-Garcia] committed the uncharged offense, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that [Sanchez-Garcia] is guilty of the charge of criminal threats. The People must still prove that charge beyond a reasonable doubt."

The court denied the prosecutor's request to include language in CALCRIM No. 375, that Sanchez-Garcia "acted with the intent that his threat be taken as a threat under [Evidence Code section] 1101," in addition to relevance as to the reasonableness and sustained fear elements of section 422.

### G. Evidence Code Sections 1101, 1109, and 352

Under Evidence Code section 1101, "[e]vidence of defendant's commission of other crimes, civil wrongs or bad acts is not admissible to show bad character or predisposition to criminality, but may be admitted to prove some material fact at issue such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

27.

mistake or accident." (*Cage*, *supra*, 62 Cal.4th at p. 273.) "In this inquiry, the degree of similarity of criminal acts is often a key factor, and 'there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: "The least degree of similarity … is required in order to prove intent.…" … By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 300.)

"Ordinarily, propensity evidence – evidence that a defendant committed an uncharged offense – is inadmissible to prove the defendant's disposition to commit the charged offense. (Evid. Code, § 1101, subd. (a).)" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 531 (*Kerley*).) Evidence Code section 1109 is an exception to the general rule against admission of " 'so-called "propensity" or "disposition" evidence' " when a defendant accused of an offense involving domestic violence has committed prior acts of domestic violence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.) "[Evidence Code s]ection 1109 provides, in relevant part, 'in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code s]ection 352.' " (*Kerley*, *supra*, 23 Cal.App.5th at p. 531.) Evidence Code section 1109 thus "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes." (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.)

"[Evidence Code s]ection 1109 defines domestic violence as having the meaning set forth in Penal Code section 13700, and the further meaning set forth in Family Code section 6211, so long as the act occurred within five years of the charged offense, subject to a hearing under to [Evidence Code] section 352. ([Evid. Code, ]§ 1109, subd. (d)(3).)" (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143.) "[Evidence Code s]ection 1109

28.

applies if the offense falls within the Family Code definition of domestic violence evidence if it does not fall within the more restrictive Penal Code definition." (*Id.* at p. 1144.)  The Family Code's definition includes abuse committed against a "person related by consanguinity or affinity within the second degree." (Fam. Code, § 6211, subd. (f).)  "Lineal kinship or consanguinity is the relationship between two persons, one of whom is a direct descendant of the other." (Prob. Code, § 13, subd. (b).)  "[P]arent and child are related in the first degree of lineal kinship or consanguinity." (*Ibid.*)

Evidence admissible under Evidence Code sections 1101 and/or 1109 "is subject to exclusion under [Evidence Code] section 352 if the probative value of the evidence is outweighed by a danger of undue prejudice.  [Citation.]  ' "The 'prejudice' referred to in … [Evidence Code] section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 164 (*Megown*); *Kerley*, *supra*, 23 Cal.App.5th at p. 532.)

We review the trial court's rulings on the admission of evidence for an abuse of discretion.  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)  We presume that a judgment or order of the trial court is correct, all intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  (*People v. Giordano* (2007) 42 Cal.4th 644, 665-667; *People v. Stowell* (2003) 31 Cal.4th 1107, 1114-1115; *People v. Santori* (2015) 243 Cal.App.4th 122, 126.)  " ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its

conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976; *People v. Smithey* (1999) 20 Cal.4th 936, 972; *People v. Turner* (2020) 10 Cal.5th 786, 807.)

### H.    People v. Culbert

As noted above, the prosecution in this case expressly relied on *People v. Culbert*, *supra*, 218 Cal.App.4th 187, in support of the motion to admit evidence about the 2015 incident.

In *Culbert*, the defendant was convicted of criminal threats arising out of an incident at his home when his teenage sons, H. and C., got into an argument. The defendant separated the boys, determined H. was the instigator, and ordered H. to go into the bathroom for a time out. H. went into the bathroom, but he yelled and cursed at the defendant. The defendant went into a bedroom and, outside the presence of the boys, retrieved his revolver and unloaded it. The defendant went into the bathroom and H. continued to curse him. The defendant spun the cylinder, placed the revolver to H.'s head, ordered him not to lie or yell at him again, and then pulled the trigger of the empty weapon at least once. H. testified he felt threatened and very scared, and believed the defendant was going to blow his head off. Following an anonymous phone call that was made to H.'s mother, H. confirmed the incident had occurred. (*Culbert*, *supra*, 218 Cal.App.4th at pp. 188-189.)

The defendant was charged and convicted of making a criminal threat to H. At trial, the court granted the prosecution's motion to introduce evidence about a prior incident when he made a criminal threat in 1999 to his former wife, the mother of H. and C., when they disagreed about visitation. During the prior incident, the defendant arrived at his former wife's apartment, ripped off the screen and broke down the front door, and threatened to kill her in the presence of H. and C. As a result of the 1999 incident, the defendant was convicted of violating section 422 and making a criminal threat to his former wife. (*Culbert*, *supra*, 218 Cal.App.4th at p. 189.)

On appeal in *Culbert*, the defendant argued the court abused its discretion when it admitted evidence about the prior incident against his former wife because it occurred more than 10 years before the charged offense and it was unduly prejudicial. (*Culbert*, *supra*, 218 Cal.App.4th at p. 191.) *Culbert* rejected the defendant's arguments and, in doing so, cited to the provisions of Evidence Code sections 1101 and 1109, and held the evidence was admissible under both statutes and was not unduly prejudicial under Evidence Code section 352. (*Id*. at pp. 191-192.)

*Culbert* held the defendant's "prior offense had probative value. [The defendant] threatened to kill H. and C.'s mother. Regardless of whether [the defendant] was armed when he broke into the apartment and made the threat, his conduct was relevant to show his intent that his statements be understood as threats, his propensity to make threats to family members and the reasonableness of H.'s fear after the threat was made. [The defendant's] prior conduct was not unduly inflammatory: his ex-wife did not recall [the defendant] being armed when he broke into her apartment and he did not actually injure her or the children. There was no possibility the prior incident would be confused with the charged crime because they occurred at different times and places and only the prior incident involved [the defendant's] ex-wife. Describing the prior incident was not time consuming." (*Culbert*, *supra*, 218 Cal.App.4th at p. 192.)

*Culbert* acknowledged the prior incident occurred 11 years before the charged offense[14] but found "this length of time does not mandate exclusion of the evidence. [Citation.] In both incidents, [the defendant] confronted family members in a small room and threatened to kill them. H. was present at both incidents. Given the similarities between the two incidents and the prior incident's relevance in proving [the defendant's]

---

**14**     Evidence Code section 1109, subdivision (e) states: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

intent and H.'s reasonable fear, the trial court had discretion to admit the evidence." (*Culbert*, *supra*, 218 Cal.App.4th at pp. 192-193.)

### I.       *The Trial Court's Apparent Reliance on Culbert*

On appeal, Sanchez-Garcia contends the court's decision to admit evidence about the 2015 incident violated Evidence Code sections 1101, subdivision (b) and 352. The People similarly address this issue based on the same statutes. Before addressing Sanchez-Garcia's contentions, it is important to determine the basis for the trial court's ruling in this case.

The prosecution moved to introduce the 2015 incident as relevant and probative of whether P.S. suffered sustained fear, and her fear was reasonable, as to the elements of the charged offense of criminal threats. The court granted the motion without clarifying the basis for its ruling but, as set forth above, the prosecution's motion was exclusively based on *Culbert*. The court later granted defense counsel's motion for a limiting instruction that stated the prior act evidence was admissible for the jury to "consider that evidence for the limited purpose of deciding whether the threat actually caused [P.S.] to be in sustained fear for her own safety and/or whether [P.S.'s] fear was reasonable under the circumstances," consistent with the grounds set forth in *Culbert*. However, the court denied the prosecutor's request to include language about the prior act being relevant to establish Sanchez-Garcia's intent.

The entirety of the record implies the trial court relied on *Culbert*, which in turn relied on both Evidence Code sections 1101 and 1109, to admit evidence about the 2015 incident. The trial court's apparent reliance on Evidence Code section 1109 is further supported by its denial of the prosecution's motion to include language about intent in CALCRIM No. 375. As in *Culbert*, Evidence Code section 1109 was applicable in this case since Sanchez-Garcia was charged with committing an act of domestic violence act against his mother, and the prior act similarly involved an act of domestic violence offense he committed against her, based on the definitions within Evidence Code section

32.

1009. In contrast to Evidence Code section 1101, evidence of the 2015 incident would have been admissible to show Sanchez-Garcia's propensity to commit such crimes. (*People v. Jones* (2012) 54 Cal.4th 1, 49-51; *People v. Hoover*, *supra*, 77 Cal.App.4th at p. 1024.)

### J. Analysis

The court did not abuse its discretion when it granted the prosecution's motion to admit the 2015 incident because, as in *Culbert*, the evidence about the prior incident was relevant and probative about whether P.S. suffered sustained fear, and whether her fear was reasonable, when Sanchez-Garcia made the statements in the car that were the basis for the charged offense of violating section 422 in this case.

Sanchez-Garcia asserts the evidence was inadmissible under Evidence Code section 1101, subdivision (b) because of the lack of similarity between the 2015 incident and the charged offense, since the 2015 incident involved a physical assault and there is no evidence Sanchez-Garcia used any physical force against P.S. during the charged offense in the car.

*Culbert* rejected the same argument that the prior offense was insufficiently similar to the charged offense even though the defendant's conduct was different during the prior incident and the charged offense. During the prior act in *Culbert*, the defendant broke into his former wife's apartment and threatened to kill her in the presence of her son (his stepson); in the charged offense, he confronted that same son in a bathroom, held an unloaded gun to his stepson's head, pulled the trigger, and threatened to harm his stepson. *Culbert* explained that both incidents were relevant, sufficiently similar, and probative because the defendant in that case "confronted family members in a small room and threatened to kill them. H. was present at both incidents. Given the similarities between the two incidents and the prior incident's relevance in proving [the defendant's] intent and H.'s reasonable fear, the trial court had discretion to admit the evidence." (*Culbert*, *supra*, 218 Cal.App.4th at pp. 192-193.)

As in *Culbert*, there was also sufficient similarity in this case between the 2015 incident and the charged offense based on P.S.'s descriptions of how the incidents occurred. At trial, P.S. admitted the 2015 incident occurred and Sanchez-Garcia hit her. While she tried to downplay the nature of her injury, she ultimately testified that Sanchez-Garcia suddenly became upset in the same manner during both the 2015 incident and the charged offense, and she was afraid in the same way as a result of his anger. Both incidents were similar and involved Sanchez-Garcia and the same victim, occurred when Sanchez-Garcia suddenly became enraged, and the prior incident was admissible to prove that P.S.'s fear was sustained and reasonable under the circumstances.

Sanchez-Garcia argues the prosecutor improperly used the 2015 incident to impeach P.S.'s trial testimony and her credibility and used closing argument to characterize the prior incident as inadmissible disposition evidence. We note that Sanchez-Garcia has not raised a prosecutorial misconduct claim in this case. In any event, as set forth in the factual statement above, P.S. testified about the 2015 incident and admitted Sanchez-Garcia hit her but gave conflicting testimony about whether he hit her head, shoulder, or back. The prosecutor confronted P.S. with her prior inconsistent statements to the investigating deputy about the 2015 incident, and later called that deputy to testify. Evidence Code section 1101 does not preclude introduction of evidence of a person's prior acts for a different purpose, including "to support or attack the credibility of a witness." (Evid. Code, § 1101, subd. (c).) Evidence of fear is relevant to a witness's credibility. (*People v. Valencia* (2008) 43 Cal.4th 268, 302.) Evidence that a witness had seen the defendant previously commit violent acts is admissible to bolster the conclusion that the witness had reason to fear the defendant. (*People v. Case* (2018) 5 Cal.5th 1, 31.) "The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." (*Allen*, *supra*, 33 Cal.App.4th at p. 1156.) The prosecution's impeachment of P.S. was not improper.

Finally, we again note that the prosecutor relied on *Culbert* when he moved to introduce evidence about the 2015 incident, *Culbert* relied on both Evidence Code sections 1101, subdivision (b) and 1109 to find the evidence was relevant and admissible, and the record strongly suggests the trial court relied on *Culbert* since it found the 2015 incident was admissible, relevant, and probative for the same reasons as relied on in *Culbert*, and denied the prosecutor's request to instruct on intent in CALCRIM No. 375. Given this reliance, it appears the court also relied on Evidence Code section 1109 to find the evidence was admissible. As a result, regardless of the admissibility of the challenged evidence under Evidence Code section 1101, subdivision (b), there was no error if the jury considered the 2015 incident as propensity evidence under Evidence Code section 1109. (See, e.g., *People v. Jones*, *supra*, 54 Cal.4th at pp. 50-51.)

### K.      Prejudice

Sanchez-Garcia asserts the alleged erroneous admission of the 2015 incident violated his constitutional rights and must be evaluated pursuant to *Chapman v. California* (1967) 386 U.S. 18. Sanchez-Garcia argues the error was not harmless beyond a reasonable doubt because the jury relied on inadmissible character and disposition evidence to convict him of violating section 422 since there was no other evidence P.S. was in sustained fear or that her fear was reasonable when he made the statements in the car.

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.* [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics in original, citing *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Lindberg* (2008) 45 Cal.4th 1, 26; *People v. Snow* (2003) 30 Cal.4th 43, 90.) " '[T]he *Watson* test for harmless error "focuses not on what a reasonable jury

35.

*could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." ' " (*People v. Clark* (2021) 62 Cal.App.5th 939, 968.)

Even if we were to assume the court improperly admitted evidence about the 2015 incident, any error would be harmless whether reviewed for federal constitutional error under *Chapman* or state evidentiary error under *Watson*. Sanchez-Garcia was charged with making a criminal threat to P.S. in the car. P.S. testified she immediately understood Sanchez-Garcia's statements to be threats, and her conduct was consistent with that belief because she immediately drove to her friend's nearby house to feel safer. While P.S.'s testimony was inconsistent about whether Sanchez-Garcia expressly threatened to kill her, any question about the nature of Sanchez-Garcia's statements and the effect on P.S. were conclusively refuted by Deputy Pruneda's testimony and bodycam recording: Deputy Pruneda testified P.S. was nervous, scared, and had tears in her eyes, and P.S. said on the recording: "He started to get agitated, 'take me here, take me here, take me,' and he began to get agitated *and he told me that he was going to kill me. He said, 'go to the field, tomorrow you see God.' And I was afraid and I came over here*." (Italics added.) P. S. told Pruneda she wanted Sanchez-Garcia arrested and she was willing to testify against him.

The court found the prior act evidence relevant to the elements of section 422 that P.S. suffered sustained fear and the fear was reasonable. However, Deputy Pruneda's testimony and P.S.'s recorded statements separately established that P.S.'s fear was sustained and reasonable, and she continued to be afraid of Sanchez-Garcia by the time Pruneda responded to the 911 call, which occurred after Sanchez-Garcia made the

36.

statements, she drove to Letty's house, ran inside, told Letty and Letty's family what happened, and agreed that someone should call 911.

We further note the jury was instructed with CALCRIM No. 375, that the jury could only consider the prior act evidence for the limited purpose of deciding whether the threat actually caused P.S. to be in sustained fear for her own safety and/or whether her fear was reasonable under the circumstances, that it could not conclude from the evidence that Sanchez-Garcia had a bad character or was disposed to commit a crime, the uncharged offense was only one factor to consider along with all of the other evidence, it was not sufficient by itself to prove that the Sanchez-Garcia was guilty of the charge of criminal threats, and the People still had to prove the charge beyond a reasonable doubt. The instruction was consistent with California law and did not reduce the prosecution's burden of proof. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1259-1260; *People v. Reliford* (2003) 29 Cal.4th 1007, 1016.)

We thus conclude that even if the 2015 incident was erroneously admitted, any error was not prejudicial.

## IV.    Ineffective Assistance; Failure to Request Voluntary Intoxication Instruction

Sanchez-Garcia contends his trial attorney was prejudicially ineffective for failing to request CALCRIM No. 3426 on voluntary intoxication, that states:  "You may consider evidence, if any, of the defendant's voluntary intoxication … only in deciding whether the defendant acted" with the specific mental state required to be convicted of a specific intent crime.

Sanchez-Garcia argues the instruction would have been supported by P.S.'s trial testimony, there was no reason counsel should not have asked for the instruction, and the failure to request the instruction was prejudicial because Sanchez-Garcia's voluntary intoxication would have negated the specific intent required for a conviction of criminal threats in violation of section 422.

37.

### A. *Ineffective Assistance*

"When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai*, *supra*, 57 Cal.4th at p. 1009; *People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

### B. *P.S.'s Testimony About Sanchez-Garcia's Alleged Drug Use*

Sanchez-Garcia did not testify at trial. Sanchez-Garcia's appellate arguments about evidence in support of a voluntary intoxication instruction are primarily based on P.S.'s trial testimony about his alleged drug use.

On direct examination, P.S. testified that everything had been okay with Sanchez-Garcia while they were driving around on the day of the incident. When Sanchez-Garcia asked her to drive to Broadway, however, something changed. "He got upset. He's not bad. He is good. Drugs make him change. He was always different at home…."

"[THE PROSECUTOR].   Now, what was going on—what led up to him saying this?  Can you describe what was happening in the car?

"[P.S.].        When he gets drugs, he gets upset.

"Q.        Was he upset that day?

"A.        No.  Everything was fine.

"Q.        At the time he was saying these comments to drive to the field, that you would see God tomorrow, did he seem upset?

"A.        Yes, he was upset.

"Q.        Did he seem angry?

"A.        Yes.

"Q.        Had you just been in an argument?

"A.        No.

"Q.        Did it just come out of the blue, out of nowhere?

"A.        Yes, because he was under the influence of drugs.

"Q.        How do you know?

"A.        Because he changes.

"Q.        So did you see him do any drugs?

"A.        No.

"Q.        On that day, you didn't see him doing any drugs?

"A.        No.

"Q.        He just got mad at you and told you to drive to the fields?

"A.        [Yes]."

On cross-examination, defense counsel asked P.S. if they had been arguing prior to Sanchez-Garcia's statement about going to the field. P.S. testified: "He got upset for nothing. I blame the drugs."[15]

P.S. testified she did not see Sanchez-Garcia use drugs earlier that day or during the drive. She suspected he used drugs because his attitude changed. They were together the whole time, he was happy, and he suddenly changed. She did not know if he had an opportunity to use drugs, but "I don't understand his change in attitude, but I blame that he does that," because suddenly he made the statement about going to the field.

Also at trial, P.S. testified Sanchez-Garcia had not been drinking when they were driving around in the car. On Deputy Pruneda's recording, however, P.S. reported that while they were driving around, Sanchez-Garcia "bought himself a beer" and then became agitated and made the statement about going to the field and P.S. seeing God.

## C. Defense Counsel's Closing Argument

Defense counsel set forth the defense theory in closing argument. Counsel admitted Sanchez-Garcia made certain statements in the car to P.S. but argued his statements did not constitute criminal threats. Counsel asserted that P.S. may have been influenced when she talked about the incident with Letty and Letty's family, that Letty and Bre became "agitated and worked up," and had decided to call the police. Counsel further asserted that Bre initially talked to the deputy, likely causing P.S. to have second thoughts about what she believed had happened, and that influenced her statement to the deputy.

Counsel separately argued Sanchez-Garcia's alleged threat was not unconditional because they were in the car, he could not act on it, and he said it would happen "tomorrow." Counsel further argued that even though Sanchez-Garcia had time to act on

---

[15] The prosecutor made a relevance objection to defense counsel's question and P.S.'s answer, and the court overruled it.

the alleged threat, he did not do anything to P.S. when she drove to Letty's house or got out of the car.

Defense counsel also addressed P.S.'s testimony that she thought Sanchez-Garcia was using drugs and argued P.S. did not know for sure and admitted she never saw him use drugs that day.

### D.    *Probation Report*

While the contents of the probation report were not before the jury, Sanchez-Garcia cites to certain statements in that report in support of his appellate argument that counsel was ineffective for failing to request a voluntary intoxication instruction.

As previously explained, Sanchez-Garcia was convicted of misdemeanor assault in May 2015, based on the incident when he hit P.S. with the table leg, and was placed on probation (§ 245, subd. (a)(1)).

In June 2015, Sanchez-Garcia was convicted of being under the influence of a controlled substance and placed on probation.  (Health & Saf. Code, § 11550, subd. (a).)

In October 2015, Sanchez-Garcia was convicted of felony robbery and sentenced to three years in prison (§ 212.5).

Sanchez-Garcia was released on parole on May 12, 2018.  On May 25, 2018, Sanchez-Garcia was convicted of possession of a controlled substance and placed on probation.  (Health & Saf. Code, § 11377, subd. (a).)  Sanchez-Garcia committed the charged incident on July 17, 2018.

#### 1.    Sanchez-Garcia's Statements

After he was convicted in this case, Sanchez-Garcia was interviewed by the probation officer for preparation of the probation report.  Sanchez-Garcia stated he first consumed alcohol when he was 14 years old and last drank in July 2018, when he was arrested in this case.  Sanchez-Garcia stated that during that time period, he drank "a 40 oz once a month."  Sanchez-Garcia further stated that "he is violent when he gets drunk

but he does not drink to get drunk," and he did not consider himself an alcoholic or a heavy drinker.

Sanchez-Garcia stated that he first used marijuana when he was 14 years old and last used in July 2018. Sanchez-Garcia said that he used two to three grams of marijuana daily during this time period. Sanchez-Garcia said he used cocaine three times when he was 14 years old. He first used methamphetamine when he was 13 years old and last used in July 2018. "During this time period, [Sanchez-Garcia] smoked 'a lot,' possibly a quarter ounce of methamphetamine daily." Sanchez-Garcia said that he first used heroin when he was 19 years old and last used on May 8, 2018, two months before the charged offense. "During this time period, [Sanchez-Garcia] injected three 'dimes' of heroin daily." He no longer considered himself a drug addict because " 'I'm in a different frame of mind now. I can get it now but it's better being sober.' "

According to the probation officer, "[w]hen asked if he was drinking or using drugs prior to the offense, [Sanchez-Garcia] stated he was drunk and had used heroin, but they did not know that. [He] further stated he drank a '32' that day and used a 'dime of heroin.' [Sanchez-Garcia] admitted alcohol and drugs played a role in the commission of the offense stating, 'I wasn't thinking.' "

### E.       Voluntary Intoxication and Criminal Threats

"The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon." (*People v. Miller* (1962) 57 Cal.2d 821, 830-831.) "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent" to commit an offense. (§ 29.4; CALCRIM No. 3426.)

A violation of section 422, criminal threats, requires the prosecution to prove the defendant made the threat with the specific intent that the statement be taken as a threat, even if there is no intent of actually carrying it out. (*People v. Toledo*, *supra*, 26 Cal.4th at pp. 227-228.)

42.

Even if a defendant is charged with a specific intent offense, the trial court does not have a sua sponte duty to give a voluntary intoxication instruction, and it is only available upon defendant's request if supported by substantial evidence. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) "A defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677; *People v. Verdugo*, *supra*, 50 Cal.4th at p. 295.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) Even upon request, however, "an intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence *also* shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state." (*People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661 (*Ivans*).)

### F.    *Analysis*

Sanchez-Garcia was charged with a specific intent offense and voluntary intoxication was potentially applicable in this case. The instruction would not have been inconsistent with the defense theory of the case as set forth by counsel in closing argument – that Sanchez-Garcia made certain statements to P.S. in the car, but those statements did not satisfy the elements required to prove a violation of section 422.

The record, however, suggests defense counsel made the tactical decision not to request a voluntary intoxication instruction. P.S. testified as to her belief that Sanchez-Garcia became upset and angry during both the 2015 incident and the charged offense because he used drugs. P.S. also testified that she never saw Sanchez-Garcia use drugs on those particular days or at any time, or that Sanchez-Garcia admitted to her that he

used drugs, even though they lived together and (according to the probation report) Sanchez-Garcia had prior drug-related convictions.

Also, at trial, P.S. testified that she did not see Sanchez-Garcia drink anything while they were together on the day of the charged offense. On the day of the incident, however, she told Deputy Pruneda that they had stopped so Sanchez-Garcia could buy a beer, and he threatened her after that. Pruneda testified that he asked P.S. if Sanchez-Garcia had any mental health issues, and she said no, but he called an ambulance to "clear" Sanchez-Garcia, raising the inference that he was clearing Sanchez-Garcia for mental health issues before he was taken into custody outside of Letty's house. Pruneda never testified that Sanchez-Garcia appeared intoxicated or under the influence of either alcohol or a controlled substance.

On appeal, Sanchez-Garcia cites to both P.S.'s trial testimony and his own posttrial statements in the probation report about his alleged drug use, in support of his argument that defense counsel was prejudicially ineffective for failing to request a voluntary intoxication instruction. Sanchez-Garcia's statements in the probation report constitute hearsay and were not before the trial court. Defense counsel received the probation report, and she was presumably aware of the report's contents, including Sanchez-Garcia's posttrial statements about his alleged drug use.

Sanchez-Garcia's account of his alleged drug use, as given to the probation officer after he was convicted, might have supported a voluntary intoxication instruction if he had similarly testified. However, defense counsel could have only requested the instruction based on evidence introduced before the jury. Since P.S. testified that she never saw Sanchez-Garcia use drugs, and there was no evidence that Sanchez-Garcia appeared intoxicated or under the influence to the arresting officer, Sanchez-Garcia's own trial testimony would have been the only way to introduce this evidence. If Sanchez-Garcia had testified at trial, he would have been impeached with his prior conviction for felony robbery, subject to cross-examination about the details of the 2015

44.

incident when he hit P.S. with the table leg and questioned about exactly what he meant and why he made the statements to P.S. in the car.

Defense counsel was a vigorous advocate for Sanchez-Garcia and sought to exclude evidence of his prior convictions, his prior conduct, and his telephone call to P.S. from jail. She vigorously objected to the prosecutor's questions on these subjects and moved for a mistrial based on the introduction of evidence about the 2015 incident. Counsel was plainly aware of P.S.'s recorded statements to Deputy Pruneda about the nature of Sanchez-Garcia's threats in the car. In closing argument, she conceded Sanchez-Garcia made some statements to P.S. but relied on the passage of time between when he made the statements and the deputy's interview with P.S. to question the role that Letty, Bre, and their family played when they talked with P.S. about what had happened, and she decided to call 911 and speak to the deputy.

As explained above, a conviction will be reversed for ineffective assistance "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai*, *supra*, 57 Cal.4th at p. 1009.) Even if requested, "an intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence *also* shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state." (*Ivans*, *supra*, 2 Cal.App.4th at p. 1661.)

The record thus suggests defense counsel made the tactical decision not to request the instruction since P.S.'s testimony was insufficient, Sanchez-Garcia would have been required to testify about his alleged drug use at the time of the charged offense, and he would have been subject to impeachment and cross-examination.

Based on the record before this court, defense counsel's decision not to pursue a voluntary intoxication instruction appears both tactical and rational under the

45.

circumstances, and we cannot find that counsel was ineffective in failing to request an instruction that would not have been supported by the evidence introduced at trial without Sanchez-Garcia's own testimony. (See, e.g., *People v. Olivas* (2016) 248 Cal.App.4th 758, 770-722.)

## V.     The Restitution Fine and Fees

On March 5, 2019, the court held the sentencing hearing, imposed the second strike term of six years in prison, and also imposed a restitution fine of $300 (§ 1202.4, subd. (b)) and suspended the parole revocation fine of $300 (§ 1202.45).[16] The court imposed a $40 court operations assessment (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373).[17]

Sanchez-Garcia contends the court improperly imposed the fines and fees without conducting a hearing on his ability to pay those amounts based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees. (*Id*. at pp. 1164, 1167.)

The People argue forfeiture, they contend that imposition of the restitution fine without consideration of Sanchez-Garcia's ability to pay was constitutional, and imposition of the assessments without a hearing on Sanchez-Garcia's ability to pay is harmless error in light of the record.

In part VI, *post*, Sanchez-Garcia contends resentencing is required in light of the recent enactment of Assembly Bill No. 124. The People concede Sanchez-Garcia is

---

[16]     Throughout the remainder of this opinion, we do not separately address the matching stayed $300 parole revocation restitution fine (§ 1202.45) because it is essentially a corollary of the section 1202.4, subdivision (b) restitution fine.

[17]     The minute order erroneously states the court suspended the "probation revocation fine" of $300 pursuant to section 1202.44. The abstract of judgment correctly states the court suspended the parole revocation fine under section 1202.45.

entitled to resentencing, and as discussed further below, we agree. Consequently, we do not reach the merits of Sanchez-Garcia's *Dueñas* claim as it is moot.

## VI. Assembly Bill No. 124

On March 5, 2019, the trial court sentenced Sanchez-Garcia to a prison term of six years, representing the upper term of three years for his conviction for criminal threats, doubled for his prior strike conviction.

Sanchez-Garcia argues he is entitled to a resentencing hearing pursuant to Assembly Bill No. 124, which went into effect on January 1, 2022. (See Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a); *People v. Camba* (1996) 50 Cal.App.4th 857, 865.) The People concede Assembly Bill No. 124 applies retroactively to Sanchez-Garcia's nonfinal judgment of conviction, requiring remand for resentencing. We agree.

Assembly Bill No. 124 amended section 1170, by adding paragraph (6) to subdivision (b). This paragraph provides the following: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, *the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense*: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) *The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense*. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(6), italics added.)

Section 1016.7 defines a "youth" to include "any person under 26 years of age on the date the offense was committed." (Stats, 2021, ch. 695, § 4.) Sanchez-Garcia was 21 years old at the time of his commitment offense, which occurred on July 17, 2018.

47.

Because of Sanchez-Garcia's age at the time of the offense, he is eligible for consideration for a mitigated prison term.

The People concede Assembly Bill No. 124's ameliorative provisions apply retroactively to Sanchez-Garcia's judgment of conviction, which has not yet reached finality. (See *Estrada*, *supra*, 63 Cal.2d at p. 744 [holding that absent evidence to the contrary, the Legislature intended amendments to statutes that reduce the punishment for a particular crime to apply to all defendants whose judgments are not yet final on the amendments' operative dates]; see also *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303-304 [applying *Estrada*'s inference of retroactivity to Proposition 57, which conferred a potentially ameliorative benefit to a certain class of juvenile offenders].) We agree as well and will therefore remand this case back to the lower court for a resentencing hearing.

## VII. Senate Bill No. 567

At the time Sanchez-Garcia was sentenced, section 1170, subdivision (b) provided the trial court with discretion to select the lower, middle, or upper term, after considering the record, the probation officer's report, other reports, statements in aggravation or mitigation, and any other evidence introduced at the sentencing hearing, based on which term, "in the court's discretion, best serves the interests of justice." (Former § 1170, subd. (b).)

Senate Bill No. 567, which became effective on January 1, 2022, makes the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist. (See Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).) Following the passage of Senate Bill No. 567, the trial court may impose an upper term sentence only where there are circumstances in aggravation, and the facts underlying all of the aggravating circumstances have been stipulated by the defendant or found true beyond a reasonable doubt by a jury or court trial. (*Ibid*.)

Sanchez-Garcia contends he is also entitled to resentencing pursuant to Senate Bill No. 567. The People concede Senate Bill No. 567 retroactive applies, but contend that since resentencing is already required pursuant to Assembly Bill No. 124, Sanchez-Garcia can raise any issues pertaining to Senate Bill No. 567 at his resentencing hearing.

In light of our conclusion in part, VI, *ante*, that Sanchez-Garcia is entitled to resentencing under Assembly Bill No. 124, we do not reach Sanchez-Garcia's claim that he is also entitled to resentencing following the enactment of Senate Bill No. 567. As Senate Bill No. 567 is now in effect, it will apply prospectively to Sanchez-Garcia's sentence, and the trial court will be required to consider the application of this new law upon Sanchez-Garcia's sentence.

## DISPOSITION

The sentence imposed is vacated and the matter is remanded for resentencing. The court shall forward the amended abstract of judgment to the proper authorities. In all other respects, the judgment is affirmed.


                                                                    SMITH, J.
WE CONCUR:


POOCHIGIAN, Acting P. J.


SNAUFFER, J.

49.